| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:13-cr-141** |
| | : | |
| **Plaintiff,** | : | **SENIOR JUDGE WEBER** |
| | : | |
| **v.** | : | |
| | : | **GOVERNMENT'S SENTENCING** |
| | : | **MEMORANDUM** |
| **GLEN GALEMMO,** | : | |
| | : | |
| **Defendant.** | | |

---

## INTRODUCTION

Over the past eight years, Glen Galemmo has operated a Ponzi scheme that has had devastating consequences for his investors. Because of Galemmo's appalling conduct, people have lost their entire retirement, life savings, and money intended for school tuition. The sad irony is that while Galemmo's investors unknowingly paid for his children to attend private schools and some college, numerous victims will no longer be able to pay for their own children's educational expenses.

What makes Galemmo's conduct so egregious – and separates him from a defendant who embezzles money from his employer or commits mortgage fraud – is that he lied to investors on a daily basis, over and over again, over the course of many years, and in so doing, he destroyed the financial future of countless individuals. Every time he met with investors, provided them marketing materials, accepted their checks, mailed their account statements, or responded to their emails

or telephone calls, he lied to them. Examples of such marketing materials and communications are attached as Exhibit A.

Galemmo was the sole owner and operator of various entities he created such as QFC, LLC; Queen City Investments; Queen City Investment Fund II, LLC; Queen City Holdings, LLC; and Queen City Hedge Fund, LLC (collectively "QFC"). Docket Entry 2, p. 10. Through these entities, Galemmo offered clients the opportunity to invest in his private equity fund and to roll over retirement accounts for him to manage. Id. Galemmo worked hard to project an image of an experienced, successful, and legitimate business man. His new office in Eden Park was decorated with high-end furnishings and outfitted with over ten, large computer screens to give investors the impression that he was constantly monitoring the market. Id. at 12. He drove expensive cars, lived in a nice house and took frequent business trips and luxurious vacations. Galemmo's hard work paid off for him because he fooled his close family and friends, and successfully solicited $87 million from individual investors, trusts, charitable organizations, and retirement accounts. Id. at 12. He solicited another $29 million from investors under the guise of short-term investment opportunities, which were really short-terms loans, with high interest rates that Galemmo desperately needed to keep his scheme afloat.

Galemmo essentially used the investor accounts as his personal bank. From January 2008 through November 2012, Galemmo used investor money to pay $52,000 in fees to his country club, and over $1 million in payments on an American

Express account held in the name of Galemmo and Queen City Holdings. Charges to the American Express account included luxurious vacations for the Galemmo family, such as over $11,000 for a vacation to Italy, over $5,000 for a Carnival cruise, tuition payments to the University of Cincinnati, property tax payments to Hamilton County, over $100,000 to J Crew Clothing store, and over $16,000 to a custom clothing designer. An example of a monthly statement Galemmo received from American Express and paid out of the QFC accounts is attached as Exhibit B.

Galemmo used investor money to finance his extravagant lifestyle. He used investor deposits to make mortgage payments on his house in East Walnut Hills, purchase a luxurious condominium in Florida on Marco Island, purchase numerous vehicles for himself and family members, and to pay for renovations in his new office building in Eden Park and serve as a down payment for the property. In addition, Galemmo spent approximately $2 million from the investor accounts on an unrelated business he owned, Midwest Hoops, which was under water and reported a loss on its tax returns.[1]

For the reasons set forth in this memorandum, the United States respectfully requests that the Court sentence Defendant Glen Galemmo to a 188-month sentence of imprisonment, which is within the guideline range resulting from an offense level of 34 and a criminal history category of I. The United States further requests that the Court order full restitution in the amount and to the victims specified in the Presentence Report.

---

[1] Photographs of some of these properties and vehicles are attached as Exhibit C.

# CALCULATION OF SENTENCING GUIDELINES

## A. Parties' Stipulated Calculations

In the plea agreement, the parties agreed on the following calculations under the United States Sentencing Guidelines ("U.S.S.G." or "guidelines"):

*Count One*: Wire Fraud, in violation of 18 U.S.C. § 1343.

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is **7**, because the statutory maximum sentence for wire fraud is 20 or more years.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), **20** levels are added because the loss to investors exceeded $7,000,000, but was less than $20,000,000.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), **4** levels are added because the offense involved more than 50 victims, but less than 250 victims.

- The government contends that pursuant to U.S.S.G. § 2B1.1(b)(19)[2], **4** levels are added because the offense involved a violation of securities and/or commodities law and at the time of the offense, the defendant was a registered broker or dealer or a person associated with a registered broker or dealer, and/or the defendant was a commodity pool operator. The final offense level for Count I is **35** (government's position) or **31** (the defendant's position).

*Count Two*: Money Laundering, in violation of 18 U.S.C. § 1956(a)(1).

- Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is the offense level from Count I.

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), **2** levels are added because Count Two is a violation of 18 U.S.C. § 1956, bringing the final offense level for Count II to **37** (government's position) or **33** (the defendant's position).

*Grouping*: Pursuant to U.S.S.G. § 3D1.2(d), Counts One and Two group and the combined offense level becomes **37** (government's position) or **33** (the defendant's position).

---

[2] U.S.S.G. § 2B1.1(b)(19) was formerly U.S.S.G. § 2B1.1(b)(18). The plea agreement referred to the former section.

*Acceptance of Responsibility*: The parties further agreed to a **2** level reduction in offense level pursuant to U.S.S.G. § 3E1.1 based upon the defendant's acceptance of responsibility, and the USAO agreed to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1** level decrease in recognition of the defendant's timely notification of his intention to plead guilty, assuming certain circumstances. **The final offense level is 34** (government's position) or **30** (the defendant's position).

### B. Calculation in the Presentence Report ("PSR")

The probation officer conducted a thorough presentence investigation as required by Fed. R. Crim. P. 32. As a result of her investigation, she determined that the loss amount was higher than the amount stipulated to by the parties. PSR, ¶¶ 15, 31, 41, and 110. Accordingly, she added 2 levels to the offense level to reflect the higher loss figure. PSR, ¶ 41. The probation officer also determined that section 2B1.1(b)(19) – about which the parties agreed to disagree – applied to the defendant and added the four-level enhancement. Thus, the final offense level in the PSR is **36**. The corresponding sentencing range for a level 36, criminal history category I is 188 to 235 months.

### C. Position of the United States

The government contends that, the loss range used for calculating the applicable offense level under section 2B1.1 and the corresponding sentencing range, should be the loss range the parties stipulated to in the plea agreement – $7 million to $20 million. As explained below, the government contends that the probation officer correctly applied the four-level enhancement in section 2B1.1(b)(19). Accordingly, consistent with the plea agreement, the government contends that the final offense level is **34**, and the resulting sentencing range is 151 to 188 months. For the reasons explained below, the government contends that a

sentence of 188 months, a sentence at the high end of the applicable guideline range, is the appropriate sentence for the defendant. In addition, the government requests that the Court order full restitution in the amount indicated by the probation officer. The government's position on restitution is further discussed below.

### D. Defendant's Remaining Objections

Galemmo raised a host of objections to the initial PSR. Many of those objections have been resolved. The majority of the remaining objections relate to the PSR's calculation of the loss amount and the application of the enhancement under section 2B1.1(b)(19). The defendant's objections have been grouped according to subject matter below. The defendant's remaining objections do not appear to involve factual disputes (aside from the loss amount discussed above) that would trigger the need for an evidentiary hearing under Fed. R. Crim. P. 32.

| Para. No. | Subject Matter of Objection | Government's Proposed Resolution |
|---|---|---|
| 15, 31, 41, 110 | Loss amount | The defendant's objection can be resolved by using the parties' stipulated loss amount to calculate the offense level. |
| 17, 43 | Application of enhancement under sec. 2B1.1(b)(19) | As explained below, the probation officer's application of the four-level increase was correct. The defendant's objection should be overruled. |
| 28 | Statement that "defendant received $87 million from individual investors, trusts, charitable organizations, and retirement accounts." | The defendant's objection is meritless. The defendant stipulated to this exact language in statement of facts to the plea agreement, which he agreed was true and correct. Docket Entry 2, p. 12. |

| Para. No. | Subject Matter of Objection | Government's Proposed Resolution |
|---|---|---|
| 32 | Victim impact statements | The defendant's objection is meritless. In paragraph 32, the probation officer describes her interactions with some of the victims. The basis of the defendant's objection is not clear. It is well-settled that a PSR may rely on hearsay. <u>Gregg v. United States</u>, 394 U.S. 489 (1969). To the extent that the defendant asserts the facts are not accurate, the defendant has not explained how the probation officer's description of her conversations with victims is incorrect. |
| 42 | Number of victims specified | The defendant's objection is meritless. In both the plea agreement and the statement of facts attached to the plea agreement, the defendant agreed that there were more than 50 victims, but less than 250 victims. <u>See</u> Docket Entry 2, pp. 4, 13. Paragraph 42 states that there are 141 victims – a number within the stipulated range. The defendant does not dispute the accuracy of that number at all. |
| 49, 97 | Final offense level | The defendant objects to these paragraphs because of his objections to the loss amount and application of the four-level enhancement in section 2B1.1(b)(19). A portion of the defendant's objection can be resolved by using the loss range stipulated to by the parties. However, as explained below, the probation officer's application of the four-level increase was correct, and should remain unchanged. |
| 52 | Acceptance of responsibility | The defendant's objection is meritless. This paragraph only addresses the defendant's acceptance of responsibility. Further, the probation officer is prohibited from including the information desired by the defendant by order of the Court. |

# FOUR-LEVEL ENHANCEMENT
## PURSUANT TO U.S.S.G. § 2B1.2(19) APPLIES TO GALEMMO

The plea agreement left one issue in dispute between the parties – whether the four-level enhancement in section 2B1.1(b)(19) applies to the defendant. Docket Entry 2, p. 4. Generally, that section imposes a four-level increase if the offense involved a violation of securities or commodities law, and the defendant held a certain position at the time of the offense. U.S.S.G. § 2B1.1(b)(19). Significantly, a conviction under securities or commodities law is not required in order for the enhancement to apply. U.S.S.G. § 2B1.1(b)(19), app. note 15. In other words, the enhancement applies "in the case of a defendant convicted under a general fraud statute if the defendant's conduct violated a securities law or commodities law." Id.

A defendant's conduct can trigger the enhancement in two ways: A) if the offense involved a violation of securities law and the defendant was "a registered broker or dealer, or a person associated with a broker or dealer," or an investment advisor at the time of the offense; or B) if the offense involved a violation of commodities law and at the time of the offense the defendant was a commodity pool operator. U.S.S.G. § 2B1.1(b)(19).[3] Both subsections of the enhancement apply to Galemmo, although only one is necessary to trigger the four-level increase.

In this case, the probation officer correctly applied the enhancement, concluding that the offense involved a violation of securities law and the defendant was a registered broker at the time of the offense. See PSR, ¶¶ 17, 43. In addition

---

[3] The enhancement also applies to a defendant who is an officer or director of a publicly traded company, an officer or director of a futures commission merchant or an introducing broker, or a commodities trading advisor.

8

to reasons stated in the PSR, section 2B1.1(b)(19) also applies because the offense involved a violation of commodities law and at the time of the offense Galemmo was a commodity pool operator ("CPO").

## A. Defendant's Violation of Securities Law

Although Galemmo did not plead guilty to a specific securities violation, the fraudulent investment scheme that he operated is a classic example of a securities fraud violation under Rule 10b-(5).  15 U.S.C. § 78j(b) and 17 C.F.R. § 240-10b-5.[4] That section makes it illegal for a person to use an instrumentality of interstate commerce to employ a scheme to defraud or engage in a course of business that defrauds any person in connection with the purchase or sale of any security.  Id. The term "security" is broadly defined by the 1934 Securities and Exchange Act, and includes an investment contract.  15 U.S.C. § 78c(a)(10); see also SEC v. W.J. Howey, 328 U.S. 293, 301 (1946) (an investment contract means "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party"). By operating a Ponzi scheme for at least eight years, whereby Galemmo solicited money from investors, those investors contributed millions of dollars to Galemmo's

---

[4] The general anti-fraud provision of the 1934 Securities and Exchange Act is codified at 15 U.S.C. § 78j(b), and explicitly imports the SEC's regulations into the criminal statute.  SEC Rule 10b-(5) provides in relevant part that it is unlawful for any person, directly or indirectly, "by the use of any means or instrumentality of interstate commerce . . . to (a) employ any device, scheme, or artifice to defraud . . . . or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240-10b-5.

hedge fund, and Galemmo caused false and fraudulent account statements to be mailed and emailed to investors, Galemmo violated Rule 10b-(5).

The enhancement is applicable to Galemmo because he was a "registered broker or dealer, or a person associated with a broker or dealer" at the time of the offense. U.S.S.G. § 2B1.1(b)(19). According to the stipulated facts in the plea agreement, Galemmo's fraudulent investment scheme began some time before 2005 and ended in July 2013. Docket Entry 2, p. 10. Galemmo was a registered broker from April 2004 through December 2007 and from December 2009 to September 2012. Ex. D (broker check report from FINRA showing Galemmo's SEC broker registration history). As such, Galemmo was a registered broker during the offense conduct and the enhancement applies to him.

### B. Defendant's Violation of Commodities Law

The four-level increase under section 2B1.1(b)(19) applies to Galemmo because his offense conduct also violated commodities law and at the time of the offense he was a commodity pool operator (CPO).

Galemmo qualifies as a CPO because he registered as one. Application note 15(a) of section 2B1.1 specifies that "commodity pool operator" is defined in the same way as it is under the Commodity Exchange Act, codified at 7 U.S.C. §1a(11). U.S.S.G. § 2B1.1, app. note 15. Significantly, the Act defines the term to include, "any person . . . *who is registered with the Commission as a commodity pool operator*." 7 U.S.C. § 1a(11)(A)(ii) (emphasis added). In other words, an individual can become a CPO simply by registering as one. Galemmo meets this definition.

From April 1, 2011 through December 16, 2013, when the National Futures Association (NFA) permanently banned QFC, QFC was registered as a CPO. Galemmo was the sole owner and principal of QFC. See Ex. E (summary of CPO registration)[5]; see Docket Entry 2, p. 10 (identifying Galemmo as the sole owner and operator of QFC). By virtue of the registration, Galemmo qualifies as a CPO.

Even if he hadn't registered, however, Galemmo would still meet the definition of a CPO under the Commodity Exchange Act because the definition also includes any person "engaged in a business that is of the nature of a commodity pool . . . or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in commodity interests, including any . . . commodity for future delivery or subject to the rules of any contract market. " 7 U.S.C.A. § 1a(11)(A)(i).

Galemmo clearly qualifies as a CPO under this broader definition of the Act as well. What little trading Galemmo did bears the hallmarks of a CPO, in that he solicited funds from investors, pooled the money from investors, and traded commodity futures using the pooled funds. The statement of facts to the plea agreement, which Galemmo agreed was true and correct, makes clear that Galemmo solicited money from investors and told investors he was pooling the money into a fund. Docket Entry 2, p. 10 ("Galemmo solicited prospective clients to invest with him based upon his promise to invest client funds in a private equity

---

[5] QFC's NFA membership ban became effective on December 31, 2013. By statute, the United States Commodity Futures Trading Commission (CFTC) delegates the registration responsibility and authority to the NFA, a registered futures association under the Act. 7 U.S.C. §§12a(1) and 21*o* (2012).

fund"); p. 11 (Galemmo represented "that the fund was routinely audited"); p. 11-12 (referring to "the fund" in emails to investors).

Moreover, Galemmo told clients that he was investing in "futures" and "commodities." Docket Entry 2, p. 11. The small amount of investor funds that were traded involved commodity futures, pooled under an account called "QFC." See, e.g., Ex. F, p. 1 (summary information from Interactive Brokers showing single, pooled account, under the name "QFC"). In addition, the registration information QFC submitted to Interactive Brokers in order to trade, noted that it traded financial futures or commodity futures and was CPO registered. Ex. F, p. 4. Finally, the account statements from Interactive Brokers, show that the trades QFC conducted involved "futures." Ex. G (example of account statement; listing "futures" under trade column beginning on page 2).

Under these circumstances, Galemmo meets the definition of a CPO. United States v. Ramunno, 2008 WL 2944634, *2 (11th Cir. 2008)(affirming conviction; no error in applying commodities enhancement to the defendant where district court found he was an unregistered CPO and commodities trading advisor because he "(a) solicited money from investors by holding himself out as a successful commodities trader, (b) accepted money from investors, (c) advised investors in merits of trading in commodities, and (d) issued earned reports to investors"); United States v. Bolze, 2010 WL 2927418, * 8 (E.D. Tenn. 2010)(applying commodities enhancement in Ponzi case to defendant; finding defendant to be a CPO "because defendant combined multiple investors' funds, transferred these funds into another account,

and then traded the funds collectively, rather than in the names of the individual investors").

Although Galemmo did not plead guilty to a commodities violation, his conduct violated commodities law in two ways. First, the misrepresentations and false statements that he made to the victims violate section 4b(a)(1)(A)-(C) of the Commodity Exchange Act (codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C)), which prohibits fraud in connection with commodity futures contracts. Specifically, by misrepresenting the fund's performance, issuing false account statements, and failing to disclose that he only invested a small portion of investor's money, among other things, Galemmo violated 4b(a)(1)(A)-(C). Docket Entry 2, pp. 10-13.

Second, Galemmo violated Section 4*o*(1)(A) and (B) of the Act (codified at 7 U.S.C. §§ 6*o*(1)(A) and (B)), which prohibits fraud by a CPO. That section prohibits CPOs from using any instrumentality of interstate commerce to defraud clients or prospective clients or engaging in any transaction or course of business that operates as a fraud or deceit upon a client or prospective client. As explained above, Galemmo was a CPO both because he was registered as one and because he meets the broader, statutory definition of a CPO. By mailing or emailing the fraudulent account statements each month to his clients, Galemmo violated this section. Docket Entry 2, p. 13. Further, by emailing updates that falsely represented that the fund was performing well, Galemmo violated this section. Id. at 11, 12.

At bottom, the four-level enhancement not only applies on its face, but its application makes sense in light of the policy reasons behind its enactment. The

sentencing enhancement was added in response to an "emergency" directive in the 2002 Sarbanes-Oxley Act, which directed the United States Sentencing Commission to promulgate guidelines to "reflect the serious nature of securities, pension, and accounting fraud and the need for aggressive and appropriate law enforcement action to prevent such offenses." PL 107-204, Sec. 1104., July 30, 2002. A 2003 amendment later expanded the scope of the guideline to cover, among other things, brokers and dealers, associated persons of a broker or dealer, and commodities violations. U.S.S.G. app. C, vol. II, amend. 654 (Nov. 2003). In so doing, the Commission noted:

> a four level enhancement appropriately reflects the culpability of offenders who occupy such positions and who are subject to heightened fiduciary duties imposed by securities law or commodities law similar to duties imposed on officers and directors of publicly traded corporations.

Id. In this case, Galemmo lauded himself as successful, experienced investor. He gave potential investors biographies, which described his experience as a trader and working with securities and private equity funds. Ex. H (examples of biographies). He used these credentials to solicit funds, and did so quite effectively. During his fraudulent investment scheme, he received more than $100 million from investors. Docket Entry 2, p. 12. He is exactly the type of individual that the Commission had in mind in drafting section 2B1.1(b)(19).

# AN APPROPRIATE SENTENCE UNDER SEC. 3553(A)

Once the Court has calculated the advisory sentencing guideline range, the Court must next consider the sentencing factors set forth in section 3553(a) in imposing a sentence that is "sufficient, but not greater than necessary, to comply with the purposes of sentencing." United States v. Massey, 663 F.3d 852, 861 (6th Cir. 2011). Due deference is accorded to the sentencing judge, who "is in the superior position to find facts and judge their import under section 3553(a) in the individual case." Gall v. United States, 552 U.S. 38, 51 (2007) (citations omitted). As explained below, a guideline sentence of 188 months is an appropriate sentence in this case.

## A. The nature and circumstances of the offense and the history and characteristics of the defendant

The nature and circumstances of Galemmo's offense are particularly egregious. The facts surrounding the offense are well-documented in the statement of facts of the plea agreement, which Galemmo agreed were true and correct, and the PSR. Docket Entry 2, p.10; PSR ¶¶ 15-31. The United States will not restate all of those facts here or repeat the offense conduct that was noted in the beginning of this memorandum. However, some aspects of Galemmo's conduct deserve emphasis.

The length and breadth of Galemmo's fraudulent investment scheme is staggering. It spanned at least eight years. Docket Entry 2, p. 10. For those eight years, Galemmo engaged in deceptive conduct and lied to his investors on a daily basis in face-to-face meetings with them. As one victim wrote in a letter to the

Court: "*He came over to our home, met our children, enjoyed our food, knowing the whole time he was going to take us for every dime we would give him.*"

The number of investors who were deceived by Galemmo is telling. As noted in the PSR, there were 141 victims. PSR, ¶ 42. However, that number only accounts for those individuals who lost money in the scheme. There were dozens of investors who were likewise fooled by Galemmo but are not considered "victims" because they did not lose their investment. The victims, and broader category of investors, varied in their level of sophistication. Some were experienced investors and others had virtually no investment experience. But all of these victims and investors were deceived equally by Galemmo's fraudulent course of conduct and misrepresentations.

The documentary trail of this case demonstrates that Galemmo worked hard to keep his scheme running by providing investors with account statements, communications, and records that appeared legitimate. To induce additional investments by his existing clients – in order to maintain the scheme – Galemmo created false documents. For example, Galemmo sent professional-looking monthly statements to his clients, which showed fictitious returns. Ex. I. Unbeknownst to the investors, the fictitious returns were generated by merely multiplying a client's account balance by a random number. Docket Entry 2, p. 13. Galemmo wooed prospective clients by providing them with professional-looking marketing materials and subscription documents. Exs. A; J. As one victim explained to the Court, Galemmo "*is a highly sophisticated con artist with the ability to manufacture*

*paper work and data that would fool the most skilled and knowledgeable investor*."
Galemmo went so far as creating fictitious trading account statements for QFC from
Goldman Sachs and Lightspeed trading, which showed account balances of
$100,462,491.26 and $83,652,314.26, respectively, when he did not even have
trading accounts open with these companies for the time period covered by the
statements.  Ex. K; Docket Entry 2, p. 12.

In the end, the victims of this case were harmed to an extent from which they
may never recover.  Because of the fictitious returns that Galemmo promised and
the misrepresentations that he made, investors gave him over $100 million to
invest.  Docket Entry 2, p. 12.  Rather than invest the money as promised, Galemmo
used the money to pay other investors, fund his own business ventures, and serve as
his personal bank account.  His selfish acts have devastated his investors, some of
whom were close friends and even family members, as evidenced by letters sent to
the Court.

The history and characteristics of Galemmo stand, for the most part, in stark
contrast to his fraudulent and deceptive conduct.  To his close friends and family,
Galemmo seemingly lived a double life.  A father to five children and supporter of
his children's sports teams on one hand; a con artist on the other hand, living a life
permeated by lies, betrayals, and misrepresentations for at least the last eight
years.

The history and characteristics of Galemmo also reveal that he benefited from a
strong upbringing and college education.  He experienced success in athletics, which

afforded him additional opportunities.  And, unlike many of the defendants who come before the Court, Galemmo has a supportive family.  Yet, Galemmo casually tossed these advantages to the side and chose to engage in a deliberate course of criminal conduct.

## B. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

The seriousness of Galemmo's offense cannot be overstated.  Many victims have written letters to the Court asking the Court to impose the maximum sentence available in recognition of the financial and emotional devastation caused by Galemmo.   Several victims have stated that they suffer from anxiety or depression as a result of Galemmo's actions and are taking medication or seeing mental health professionals to deal with the stress.  As two victims explained in letters submitted to the Court:

> *"Personally, I have experienced high stress and anxiety with the realization my life savings has been taken from me and my family.  I have wondered how I will pay for my daughter's wedding in the future or how both my wife and I will survive if I lost my job.  I have been seeing a counselor to help me deal with these things."*

> *"The financial loss is one thing but the mental anguish that we endure is daily torture plus knowing at our age it is impossible to make a financial recovery."*

Ninety-one of the victims in this case had retirement accounts with Galemmo; many of those individuals lost their entire investment because they had not yet begun to make withdrawals from their accounts.  The individuals who did

make monthly withdrawals are retirees and lost the remaining balance of their

retirement accounts. Now they must rely entirely on Social Security or liquidate

assets, such as homes they have owned for many years, merely to survive. Several

retirees wrote letters to the Court advising the Court of their advanced age and the

impossibility or unlikelihood of finding work in this economy at their age. As

several retirees wrote to the Court:

> *"Investing with Mr. Galemmo destroyed my IRA savings. I am 83 years old; Glen has taken virtually all of my planned retirement savings. How can I manage my wife's Alzheimer's Disease disability as the effects worsen and she needs more skilled care?"*

> *"We have been forced to liquidate anything we can in order to survive this situation. As a result of this, we are suffering from extreme mental stress and high anxiety with many sleepless nights. And these symptoms aggravate our other medical problems. In September 2013 my wife was diagnosed with breast cancer. On top of worrying about my wife's condition, we were worrying about how we would pay for all of this on our limited income."*

> *"We are both in our 80's . . . . Not having this source of money has been a tremendous hardship on us. Initially, we had to use credit cards at a very high interest rate to cover our expenses. When we found that we were not going to get back our money any time soon, we applied for a reverse mortgage."*

> *"Not only do we no longer have the means to maintain our simple, retired lifestyle (which we worked a lifetime for) we are trying desperately just to stay in our home of 40 years. Each new day has become an emotional, frightening, depressing existence. We've gone from relatively comfortable retirees to not even being able to meet our monthly expenses and getting worse as time goes on."*

Galemmo fully knew that these victims were entrusting him with their retirement funds or life savings, yet he solicited the investments and stole the money anyway. The seriousness of Galemmo's conduct supports a sentence at the high-end of the advisory guideline range.

A significant sentence also is needed to promote respect for the law. Documents and communications show Galemmo was aware of the prosecution of other Ponzi and embezzlement schemes, yet continued down his chosen path. For example, one of the items located during a search warrant of Galemmo's business was a collection of articles about the prosecution of brokers and bank employees involved in financial crimes that had been printed in <u>2008</u>. Ex. L.[6] Similarly, when someone forwarded Galemmo an email in 2012 entitled "12 Signs Your Financial Planner Is The Next Bernie Madoff," Galemmo responded, "What you think I'm Bernie Madoff????????? You can feel free to call my accountant here in town." Ex. M. In addition, Galemmo reportedly distinguished himself from Mr. Madoff by falsely telling victims that he did not keep custody of investor's IRA funds. An employee of Galemmo's explained to a potential investor that "Glen wisely chose to remove himself as the custodian of the investor's money. No single individual is custodian which was the problem with the Bernie Madof[f] scandal. All moneys invested with Queen City is held in trust with Millennium Trust Company . . . and is insured just like every other investment firm like Fidelity or Vanguard. In short,

---

[6] The documents were found in a file cabinet in Galemmo's assistant's office. The file cabinet had previously been located in a space she shared with Galemmo. The assistant indicated she had never seen the documents before and did not print them.

no one can steal your money . . ." Ex. N.  Galemmo's actions not only demonstrate an utter disregard for the law, but also a complete disregard for his victims and the pain that he was inflicting.

## C. The need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant

The need for the sentence imposed to afford adequate deterrence, both generally to other would-be Ponzi operators, and specifically to Galemmo, is high. Deterrence is particularly important given today's economy and the public's increasing reliance on life savings, 401(k) accounts, and IRAs to fund retirement. While the uncertainty of Social Security's future looms, fewer employers offer pensions like they did a generation ago.  As a result, victims like those in the instant case work their entire life, foregoing luxurious vehicles and vacations like Galemmo gave to his family, to simply save enough money for retirement.  These savings and retirement accounts have become an attractive target to criminals, like Galemmo, who need to keep their fraudulent scheme afloat, while maintaining their extravagant lifestyle.  A sentence of 188 months – a sentence at the high end of the guidelines range – will deter others contemplating a fraudulent investment scheme.

The sentence also must deter Galemmo from committing future crimes and protect the public from him.  The recent motion the United States filed seeking forfeiture of additional proceeds of Galemmo's scheme aptly demonstrates why the need to protect the public is so important in this case.  See Docket Entry 27.  The declaration attached to the motion describes additional, disturbing conduct by

Galemmo. The declaration reveals the relative ease with which Galemmo transferred property and money – which he knew was derived from investor deposits – to his wife, through a maze of bank accounts. Such deceptive conduct must be deterred by the sentence in this case.

**D. The applicable advisory guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants convicted of similar conduct**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the section 3553(a) factors particularly relevant to an individual defendant is the best available way to prevent the disfavored result of widely-varying sentences for similar conduct. As the Supreme Court noted in <u>United States v. Rita</u>, "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of the sentence that might achieve § 3553(a) objectives." 551 U.S. 338, 350 (2007).

In particular, post-*Booker*, this Court has found a sentence within the applicable advisory guidelines range reasonable and appropriate in two recent Ponzi scheme cases. <u>See</u> <u>United States v. Snelling</u>, Case No. 1-12-58-001 (sentencing Snelling to 131 months, which was within the applicable guideline range); <u>United States v. Powell</u>, Case No. 1-10-075 (sentencing Powell to 121 months, which was within the applicable guideline range).

While the United States is not advocating for an above-guidelines sentence, it is important to note that if anything, the guidelines as applied in this case underrepresent the seriousness of Galemmo's crimes because the fictitious earnings that Galemmo reported to victims – and that victims relied upon in making important life decisions, such as whether and when to retire – are simply unaccounted for under the sentencing guidelines.[7]  They are not included in the loss calculation under 2B1.1, nor elsewhere in that section.  For this reason, a sentence of 188 months, which is the high-end of the applicable range (34, I), is warranted.

### E. The need to provide restitution to any victims of the offense

Restitution is mandatory in this case.  18 U.S.C. § 3663A(c)(1); PSR ¶¶110-11.  In addition, the need to provide restitution to the victims of Galemmo's scheme is extraordinarily high.  As explained above in relation to the seriousness of the offense, many victims lost their entire life savings and retirement.  The restitution prong of the section 3553(a) factors will be fulfilled by the Court's entry of an accurate and complete restitution order.

The United States has seized and seeks forfeiture of more than $5 million in cash from various accounts and numerous properties and vehicles that are proceeds of Galemmo's fraudulent investment scheme.  The United States intends to distribute these assets to the victims through the administrative restoration

---

[7] As one victim wrote to the Court, *"[T]he returns that we received led us to make life decisions.  My wife stopped working as we believed we were on track to have a comfortable retirement.  We later added additional funds . . .  based on the strong performance being reported and seemingly documented in the monthly and annual statements."*

process.  In order to begin that process, a complete restitution order that identifies all victims of Galemmo's scheme and the restitution owed is required.  That order, along with other documentation will be forwarded to the United States Department of Justice for approval.  After approval is obtained and any relevant ancillary proceedings are concluded, the forfeited funds will be applied to the restitution ordered by the Court and distributed to the victims named in the Court's restitution order on a *pro rata* basis.

The United States agrees with the list of victims and restitution amounts submitted by the probation officer to the Court.  Ex. O.[8]  The restitution amounts are the product of a lengthy investigation and extensive analysis of records by the IRS.  In determining the restitution owed, the IRS relied upon Galemmo's bank records, Galemmo's business records, documents from third-party IRA custodians such as Millennium and PENSCO, documentation from victims (including account records, cancelled checks, communications with Galemmo or other employees, and documents provided to victims by Galemmo), and interviews.  If necessary, the United States will be prepared to provide testimony and evidence to prove the restitutions amounts in the PSR by a preponderance of the evidence during the sentencing hearing.

---

[8] The original spreadsheet documenting restitution information was provided to defense counsel and the probation officer on February 13, 2014.  Since that time, the government has learned of an additional withdrawal, which decreased the restitution total by $1,000.  The government is attaching an updated restitution spreadsheet, which reflects the additional withdrawal.  The restitution amount in the PSR is correct and already reflects the additional $1000 withdrawal. See PSR, ¶¶ 15, 110.

## CONCLUSION

For the reasons set forth above, after giving full consideration to the 18 U.S.C. § 3553(a) factors, the United States respectfully requests that the Court sentence Defendant Glen Galemmo to a 188-month sentence of imprisonment, which is within the guideline range resulting from an offense level of 34 and a criminal history category of I. The United States requests that a period of three years of supervised release follow the term of imprisonment. The United States further requests that the Court order full restitution in the amount and to the victims specified in the PSR.

Respectfully submitted,

CARTER M. STEWART
United States Attorney

s/*Emily N. Glatfelter*
EMILY GLATFELTER (0075576)
TIMOTHY S. MANGAN (0069287)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711; Fax: (513) 684-6385

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Government's Sentencing Memorandum was served this 14th day of August, 2014, electronically on: Benjamin Dusing, counsel for Glen Galemmo.

s/*Emily N. Glatfelter*
Emily N. Glatfelter (0075576)
Assistant United States Attorney