```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION

                              - - -

UNITED STATES OF AMERICA,    . Case No. 1:13-cr-141-1
                             .
         Plaintiff,          . Sentencing Hearing, Excerpt of
                             . Testimony of Elizabeth Shorten
         - v -               .
                             .
GLEN GALEMMO,                . Wednesday, August 27, 2014
                             .
         Defendant.          . Cincinnati, Ohio
. . . . . . . . . . . . . . . .


                 EXCERPT OF TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE HERMAN J. WEBER, SENIOR JUDGE


For the Plaintiff:      EMILY N. GLATFELTER, ESQ.
                        TIMOTHY S. MANGAN, ESQ.
                        Assistant U.S. Attorneys
                        United States Attorney's Office
                        221 East Fourth Street, Suite 400
                        Cincinnati, Ohio  45202

For the Defendant:      BENJAMIN G. DUSING, ESQ.
                        ANGELA M. HAYDEN, ESQ.
                        The Law Offices of Benjamin G. Dusing,
                        PLLC
                        50 East RiverCenter Boulevard
                        Suite 820
                        Covington, Kentucky  41011

Also present:           Laura S. Jensen, Probation Officer
                        Special Agent Elizabeth Shorten,
                        Internal Revenue Service

Law Clerk:              Amy Peters Thomas, Esq.

Courtroom Deputy:       Elizabeth Brockmeier

Court Reporter:         Luke T. Lavin, RDR, CRR
                        838 Potter Stewart U.S. Courthouse
                        100 East Fifth Street
                        Cincinnati, Ohio  45202
```

*Proceedings recorded in stenotype;*
*transcript prepared by computer.*

P R O C E E D I N G S

\* \* \*

AFTER RECESS

(In open court at 3:32 PM.)

THE COURT: Please be seated.

Is the United States ready to proceed?

MR. MANGAN: We are, Your Honor. We'd like to call Agent Shorten to explain the restitution methodology.

THE COURT: Thank you.

Is the defense ready to proceed?

MR. DUSING: We're ready to proceed, Your Honor.

THE COURT: Proceed.

MR. MANGAN: All right. Your Honor, we'd call Agent Beth Shorten.

THE COURT: Proceed. Swear the witness.

COURTROOM DEPUTY: Raise your right hand, please.

(Elizabeth Shorten is duly sworn by the courtroom deputy.)

ELIZABETH SHORTEN

a witness herein, having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MANGAN:

Q. Agent Shorten, could you state your full name and spell your last name.

A. Elizabeth Shorten, S-h-o-r-t-e-n.

1  Q.  Can you explain where you work and what your job title is.
2  A.  I'm a special agent with the Internal Revenue Service
3  Criminal Investigation Division.
4  Q.  Can you just pull the mike up a little, please.
5  A.  (Complies with request.)
6  Q.  Thank you.  And were you involved in the investigation of
7  Glen Galemmo's case here today?
8  A.  Yes.
9  Q.  And as part of that did you collect a variety of bank
10 records and other records relating to his financial dealings?
11 A.  Yes.
12 Q.  Did you also collect records from various investors and
13 other victims?
14 A.  Yes.
15 Q.  All right.  Were you also involved in collecting records
16 related to a search warrant?
17 A.  Yes.
18 Q.  All right.  Now, as part of your duties in this case did
19 you compile a list that would try to calculate whether
20 particular investors suffered a loss or not?
21 A.  Yes.
22 Q.  All right.  Can you explain for the Court your methodology
23 in determining whether or not a particular investor had a loss
24 or not.
25 A.  Yes.

1    I started with the four main bank accounts of Queen City
2 that were at U.S. Bank.  The investors' money was deposited
3 into those four accounts throughout the scheme.  Withdrawals
4 that were paid to the investors were also made out of those
5 accounts.
6    So I started by analyzing the deposits and withdrawals into
7 those accounts by investor.  Then I used IRA records from the
8 third-party IRA custodians to supplement those records, because
9 some of the investors sent their money directly to the IRA
10 custodian, and then the IRA custodian sent it to the U.S. Bank
11 accounts for Queen City.
12    I also supplemented that with the investors' records that
13 they provided themselves and corroborated their accounts of
14 what they deposited and withdrew with what was shown in the
15 bank records.  From there I determined all of the deposits and
16 all of the withdrawals made by each investor, and I came up
17 with a net amount for each investor.
18    The investors that determined that they had deposited more
19 than they withdrew had shown a loss and are included in the
20 restitution amounts.
21    The investors that I determined withdrew more money than
22 they deposited are not included in the restitution calculation.
23 Q.  Okay.  Now, when you made a list of all of the investor
24 deposits, okay, let's say we're talking about one particular
25 investor, and you looked at their deposits, did you attempt to

1  differentiate whether or not that was considered an investment
2  in a stock, versus a loan or versus some other type of
3  investment?
4  A.  No.
5  Q.  Okay.  So were you simply just looking at the amount that
6  was deposited from that investor?
7  A.  Yes.
8  Q.  Okay.  In terms of the withdrawals that came out from Mr.
9  Galemmo's companies to the investor, did you attempt to
10 delineate whether or not that payment was a purported return or
11 whether it was a return of principal or anything else?
12 A.  No.
13 Q.  Okay.  So did you simply look at the net dollars in
14 compared to the net dollars out?
15 A.  Yes.
16         MR. MANGAN:  All right.
17    Your Honor, I believe that summarizes the methodology.  We
18 do have tables.  I can go through a particular example, but if
19 the Court's satisfied, we could stop there.
20         THE COURT:  Maybe if Mr. Dusing would want to examine
21 at this point.
22         MR. DUSING:  Just a couple of questions, Your Honor.
23         THE COURT:  Why don't you.
24                       CROSS-EXAMINATION
25

BY MR. DUSING:

Q. Special Agent Shorten, my name is Ben Dusing. I represent Mr. Galemmo. We are familiar with each other, are we not?

A. Yes.

Q. Just a few questions. I believe you testified that you did not, in fact, delineate between loans or investment monies in conducting your analysis. Could you have?

A. Not with the records that I had, no.

Q. Is it not true, though, that within the fund files that there are instances, several instances of documented loans? For example, there are notes, et cetera.

A. Yes.

Q. The funds reflected by those notes, would they have been included in your analysis conducted as you've described it?

A. Yes.

Q. All right. And it is the case as well, is it not, that in the course of your investigation, speaking with various investors, they did indicate that, in fact, part of the money that they sent to Mr. Galemmo in some instances was, in fact, loans?

A. Yes.

MR. DUSING: Your Honor, no further questions.

THE COURT: Now, the loans were based on notes that were issued by the defendant to these various individuals; is that correct?

1          THE WITNESS: Right. He approached the individuals
2    for short-term loans and provided, in some cases, a note, but
3    not in all cases, for the terms of the loan.
4          THE COURT: So the, quote, mortgagor -- or the
5    mortgagee, or whatever we call the creditor, would actually
6    give to the defendant X dollars and expect that to be repaid in
7    a short length of time and add interest; is that right?
8          THE WITNESS: Right.
9          THE COURT: And were you able to look at any records
10   about whether they were paid back or not?
11         THE WITNESS: Yes. And in most cases, especially for
12   the early loans throughout the scheme were paid back because
13   they were generally less than 30-day loans. Also in some cases
14   the principal or the interest of the loan was actually rolled
15   over into the hedge fund, or Mr. Galemmo told them he was
16   rolling it over.
17         THE COURT: And when they were rolled over to the
18   hedge fund, then that accounting transaction would show that
19   there was a deposit in the hedge fund for whatever the amount
20   of payment was?
21         THE WITNESS: Right. But there was no actual
22   accounting for the hedge fund, so I was going strictly with the
23   bank records. So the initial loan, when it was deposited into
24   U.S. Bank, I counted that as a deposit, so --
25         THE COURT: Now, was that a deposit to the defendant?

1     THE WITNESS: Yes.
2     THE COURT: It wasn't a deposit to one of the victims?
3     THE WITNESS: No. When they were paid back, I counted
4  that as a withdrawal. So when they were paid back the
5  principal plus interest, their restitution amount was actually
6  lowered in the end because they made gains on those.
7     THE COURT: And that would be paid -- when they were
8  paid back, then that would be eliminated from my concerns with
9  the case; is that correct?
10    THE DEFENDANT: Right. Well, a lot of the hedge fund
11 investors did the short-term loans as well. Maybe not a lot,
12 but a handful of them.
13    THE COURT: And the $29 million figure that I've been
14 told about these short loans, was that your figure?
15    THE DEFENDANT: No. That was provided by the
16 defendant.
17    THE COURT: The defendant said that that was the
18 amount of these loans he had?
19    THE DEFENDANT: Yes. So I came up with the hundred-
20 plus figure that was deposited into Queen City, and he said
21 that 29 million of that a hundred-plus million was for short-
22 term loans.
23    THE COURT: I see. In other words, you had the total.
24 The figure you were dealing with were both loans and, of
25 course, the deposits?

1          THE DEFENDANT:  Right, the hedge fund deposits.
2  Because everything went into the same bank accounts.
3          THE COURT:  And then the loans were -- he used, of
4  course, the money as he chose.  And the amount, then, that went
5  to the hedge funds, the deposits that were supposed to go into
6  the hedge funds, were they then transferred to the accounts?  I
7  know it was all a paper transaction.
8          THE DEFENDANT:  Uh-huh.
9          THE COURT:  But were they transferred to the -- did
10 they appear on the accounts of the individuals as their
11 interest in the hedge fund?
12         THE DEFENDANT:  There was no accounts.  They received
13 account statements each month, so the deposits did appear on
14 the account statements for the investors.
15         THE COURT:  And it would be the deposit to the hedge
16 fund?
17         THE DEFENDANT:  Right.
18         THE COURT:  And there would be a balance of the value
19 of the hedge fund or --
20         THE DEFENDANT:  Yes.
21         THE COURT:  And that value fluctuated from time to
22 time?
23         THE DEFENDANT:  Right.  Every month they received a
24 monthly statement with their investment plus interest received
25 for that month.  So every month their investment would go up if

```
 1   they didn't make withdrawals.
 2            THE COURT:  And did you examine those documents?
 3            THE DEFENDANT:  I did not examine all of them.  I did
 4   examine some.
 5            THE COURT:  I see.  Okay.  Thank you.
 6            MR. MANGAN:  Your Honor, if I could, just two more
 7   questions to clarify.
 8            THE COURT:  Sure.  Certainly.
 9                       REDIRECT EXAMINATION
10   BY MR. MANGAN:
11   Q.  Agent Shorten, in terms of money that came in to Glen
12   Galemmo that was called a loan, was that money often then used
13   to pay a different investor?
14   A.  Yes.
15   Q.  And in terms of the money that went back to an investor as
16   repayment of the loan --
17       Okay?
18   A.  Uh-huh.
19   Q.  -- did that money often come from a different investor?
20   A.  Yes.
21            MR. MANGAN:  That's all I had, Your Honor.  If there
22   are no more questions related to the methodology, we could
23   address the list.
24            THE COURT:  Mr. Dusing, do you wish to examine?
25            MR. DUSING:  No, Your Honor.
```

```
 1         MR. MANGAN:  Thank you.  I'd ask that Ms. Shorten be
 2   excused.
 3         THE COURT:  Yes.  Thank you very much.
 4      (Witness excused.)
 5      (End of requested excerpt.)
 6                            * * *
 7
 8               I N D E X   O F   W I T N E S S E S
     WITNESS:                                              PAGE
 9
     ELIZABETH SHORTEN
10   Direct Examination by Mr. Mangan ..................  2
     Cross-Examination by Mr. Dusing ...................  5
11   Redirect Examination by Mr. Mangan ................ 10
12                            - - -
13                    C E R T I F I C A T E
14         I, Luke T. Lavin, RDR, CRR, the undersigned, certify
15   that the foregoing is a correct transcript from the record of
16   proceedings in the above-entitled matter.
17
18                              s/Luke T. Lavin
                                Luke T. Lavin
19                              Official Court Reporter
20
                                - - -
21
22
23
24
25
```